# In the United States Court of Federal Claims

No. 13-103 C
(Filed: November 22, 2013)
Released for publication: February 28, 2014[1]

**********************************************

| | |
|---|---|
| **OPTIMIZATION CONSULTING, INC.,** | * |
| | * |
| | * |
| Plaintiff, | * |
| | * |
| v. | * |
| | * |
| **THE UNITED STATES,** | * |
| | * |
| Defendant, | * |
| | * |
| and | * |
| | * |
| **GOLDBELT GLACIER HEALTH** | * |
| **SERVICES, LLC,** | * |
| | * |
| Intervenor-Defendant. | * |
| | * |

**********************************************

*Sharon O. Steele*, Watson & Associates, LLC, Washington, D.C., for Plaintiff.

*John S. Groat*, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for Defendant.

*Elizabeth M. Gill*, Patton Boggs, LLP, Washington, D.C., for Intervenor-Defendant.

———————————

## OPINION AND ORDER

———————————

**DAMICH**, Judge:

---

[1]  The court issued this opinion under seal on November 22, 2013, and gave the parties to December 9, 2013, to propose the redaction of competition-sensitive, proprietary, confidential, or otherwise protected information.  The court has accepted the parties' proposed redactions, which are indicated herein  in the format of three consecutive asterisks within brackets ("[***]").

In this post-award bid protest, Plaintiff and Defendant have filed cross-motions for judgment on the administrative record (AR) with respect to a request for proposals (RFP), No. W9133L-12-R-0024 (the Solicitation) issued by the National Guard Bureau (NGB) on July 6, 2012, for proposals to provide psychological health support services to the Army and Air National Guards (ARNG and ANG, respectively).  The RFP was issued as a small business set-aside and provided for the award of multiple, indefinite-delivery/indefinite quantity contracts with a 3-year base period and a 2-year option period.  AR 854.

There were 10 proposals submitted in response to the Solicitation.  *See* Def.'s Mot. for J. upon the AR and Resp. to Pl.'s Mot. for J. on the AR with App. (Def.'s Mot.) at 4.  The NGB selected four offerors, not including OCI, for inclusion into a competitive range for the purposes of further communications or clarifications. AR 5935.  Per Section L.1.2 of the Solicitation, "In evaluating the proposals, the Government may establish a Competitive Range to reduce the Offerors participating in the competition to only those Offerors most likely to receive the award."  AR 968-969.

OCI protests its exclusion from the competitive range, arguing that the NGB: 1) erred in its evaluation of the price and past performance elements of OCI's proposal; 2) failed to exhibit good faith and fair dealing; 3) improperly evaluated the past performance of a competing offeror Goldbelt Glacier Health Services (Goldbelt Glacier);[2] and 4) should have referred OCI to the Small Business Administration (SBA) for a responsibility determination before excluding it from the competitive range.

Defendant asserts, however, that the court lacks jurisdiction to hear OCI's complaint because OCI has failed to meet its burden to establish standing to bring its action.  OCI, the government avers, has the burden to prove that it is an "interested party," by showing a direct economic interest that would be affected by the award.  *Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1307 (Fed. Cir. 2006).  The thrust of the Government's argument is that OCI "would still have been excluded from the competitive range even if the NGB had calculated OCI's price in the manner that OCI now contends the solicitation required," and thus "suffered no possible competitive harm and no prejudice."  Def.'s Mot. at 13.

Defendant further argues, inter alia, that the record reflects substantial evidence in support of the NGB's rating of OCI based on past performance and its exclusion of OCI from the competitive range on that basis.

For the reasons stated below, the court denies OCI's motion for judgment on the AR and grants Defendant's cross-motion.

---

[2]  Goldbelt Glacier, Intervenor- Defendant here, was one of two bidders who were subsequently awarded contracts under the Solicitation.  *See* Office of the Assistant Secretary of Defense (Public Affairs), U.S. Department of Defense (March 21, 2013), available at http://www.defense.gov/Contracts/Contract.aspx?ContractID=5002 (last visited November 21, 2013).

I.      Background

OCI is a minority-owned, service-disabled veteran-owned, small disadvantaged business, Compl. at 6.  Prior to the procurement at issue here, it served as a contractor for the NGB providing mental health support services to the ANG on a pilot project.  Pl.'s Mem. in Support of J. on AR (Pl.'s Mot.) at 34-35.  The pilot project was less comprehensive geographically and substantively than that proposed in the instant Solicitation.  Transcript of Hearing, Feb. 12, 2013 at 18:16-25.  According to OCI, over 80% of its employees and revenues derive from the support services provided via the pilot project.  Pl.'s Mot. at 35.

In the course of its work on that contract, OCI developed dissatisfaction with the performance on the project of its National Director of Psychological Health, Dr. Beth Zeiger.  Pl.'s Mot. at 10; *see also* Decl. of Richard Holmes, OCI Chief Operations Officer, Apr. 22, 2013, Docket # 29.  Dr. Zeiger was subsequently placed on a performance improvement plan and ultimately terminated her employment.  OCI relates that key agency personnel were discomforted that they were not informed in advance of OCI's actions with respect to Dr. Zeiger.  *See* "Post Meeting Report," Docket # 30, Attachment 1 ("Post Meeting Report").[3]  The Dr. Zeiger matter features notably in OCI's objections to NGB's rating of OCI's past performance.

The RFP was issued on July 6, 2012.  In its terms, it provided that proposals would be evaluated on a best-value basis, encompassing three non-price factors and one price factor.  AR 984-85.  In order of priority, the factors were: Mission Capability, Past Performance, Small Business Participation, and Price.  *Id*.[4]  The non-price factors, when combined, were more important than the price factor.  *Id*.  The mission capability factor included two subfactors of equal weight: 1) overall capability and 2) representative tasks for ANG and ARNG Director of Psychological Health (DPH) support.  *Id*.  The overall capability subfactor included four elements: "Corporate Experience," "Corporate Resources," "Continuous Quality Improvement Plan," and "Quality Control Plan."  AR 595-96.

With respect to past performance, the RFP provided:

> The Government will evaluate past performance of three
> (3) current or previous contracts for relevancy based on
> how well the contractor performed on projects of similar
> dollar value, scope, and complexity.  Offerors are advised
> that the Government may use past performance information

---

[3]  Defendant objects to any consideration of the Holmes Declaration and the "Post Meeting Report" as impermissible "extra record evidence."  Def.'s Mot. at 25.  The Court addresses the Government's objections in due course.

[4]  Thus, an offeror's proposal was to consist of five volumes: Volume I – Mission Capability; Volume II – Past Performance; Volume III – Small Business Participation; Volume IV – Cost/Price; and Volume V – Solicitation, Offer and Award Documents and Certifications/Representations.  AR 591.

> obtained from centralized past performance databases and
> sources other than those identified by the offeror . . .

AR 598.

Each offeror was provided an alphanumeric code to use in its proposal in order to preserve anonymity. AR 968. OCI's code was 09C4. AR 2854. The original deadline for submission of proposals was August 6, 2012. AR 197. Amendment 3 to the Solicitation, posted on July 30, 2012, changed the response date to August 8, 2012. AR 713. Amendment 4, posted on August 3, 2012, changed the due date to August 9, 2012. AR 789. OCI submitted its proposal, under its code "O9C4," by the August 9 deadline.

On August 30, 2012, however, after the earlier August 9, 2012, due date for proposals had passed, the NGB issued Amendment 5, in which offerors were provided a revised "price model" and instructed to "provide revisions, specifically, updated pricing in accordance with the updated Price Model, Attachment J-3 attached hereto no later than" midnight on September 5, 2012. AR 826. The revised price model was intended "to facilitate evaluation of proposed prices for task orders and ceiling prices for various labor categories," AR 827,[5] and was to be submitted electronically "in Microsoft Excel file format." AR 826. Questions relating to Amendment 5 were required to be submitted no later than 4:00 p.m. on August 31, 2012. *Id.* As in the previous price models, the revised price model called for offerors to calculate a Total Contract Life Price (TCLP). "Offerors are advised that the TCLP as determined by the price model formulas will be used for the purpose of price evaluation only . . ." AR 828.

Additionally, Amendment 5 provided:

> Any explanatory pricing notes shall be provided on a
> separate PDF document. Pricing notes should be limited to
> explanation of details not readily discernible from the price
> model and shall not contain qualifications or options which
> could result in a change of price or lack of clarity as to the
> offeror's proposed price as the price model and the TCLP
> calculated by the price model will be the only price
> evaluated.

*Id.*

On September 1, 2012, the NGB issued Amendment 6, providing a second revision to the price model, with a cover email stating, "The attached amendment revising [sic] providing responses to offeror questions and additional corrections to the price model for this solicitation is hereby issued." AR 830. Amendment 6 included a

---

[5] This language from Amendment 5 is almost a verbatim repetition of similar instructions in Amendment 2, posted on July 28, 2012: "Offeror's [sic] are required to submit the attached Price Model (Attachment J-3) to facilitate evaluation of its proposed prices for task orders and ceiling prices for various labor categories." AR 603.

question and response table for questions apparently submitted in accordance to the instructions of Amendment 5. AR 842. A question posed by OCI, *see* AR 6235, was:

> Is the Government requesting that contractors transfer all information from their finalized price quote (submitted on August 9th, 2012) into the newly updated spreadsheet format? If this is not the case, does this mean the Government is providing contractors with the option of recalculating and resubmitting a new price quote other than what was required to be calculated and submitted by August 9th?

The agency's response in the table incorporated within Amendment 6 was:

> Offerors are permitted to recalculate price as they see fit and are advised to ensure proposed prices comply with all requirements of the most recently provided amendments and any updated appendices found therein. Offerors may provide additional detail not originally provided as they see fit in order to ensure the Government has sufficient basis to determine reasonableness and realism of proposed prices.

AR 842.

On September 4, 2012, the NGB issued yet another amendment to the pricing model, Amendment 7, which advised, "On tab II.b TCLP, cell 'G25' should read as: ='II.a – Ceiling Rates '!C9. For expediency, you may wish to modify the current price model that you are working with as it is no [sic] locked like the original version of the file." Offerors needing additional clarification were directed to contact the NGB contracting officer by email, "though I cannot guarantee a response prior to the time revisions are due." AR 6243.

OCI avers that it "attempted to insert the new rates into the updated excel spreadsheet provided by the Agency in Amendment 7." Pl.'s Mot. at 7. Just prior to its submission of its revised and final price proposal on September 5, 2012, OCI encountered, however, what it characterizes as "calculation errors" still remaining in the spreadsheet." *Id.* It asserts that it attempted to advise the Contracting Officer, but the AR reflects only an ambiguous email on the afternoon of September 5, 2012, from OCI to the NGB: "This message serves as notification that we had an error in migrating data from the original pricing spreadsheet to the most recent version amended yesterday and our revised pricing model is forthcoming." AR 6199.

In its final submission, OCI's price model provided a TCLP of $265,619,111.06. AR 4703. In its motion for judgment on the AR, OCI claims, however, that the price model itself utilized an erroneous formula to determine the TCLP, because the price model's TCLP failed to take into account variable labor rates based on geographic

regions and instead relied on ceiling rates for several labor categories.  Pl.'s Mot. at 15.  Thus, OCI argues that its price model TCLP was "artificially inflated" compared to OCI's independent, off-price model total price of $199,444.166.45 "based on actual labor rates OCI offered for each of the various labor categories by geographic regions."  *Id*. at 14.

Therefore, just below the price model's field indicating OCI's TCLP of $265,619,111.06, OCI inserted its conflicting total price calculation of $199,444.166.85 into an otherwise blank section of the price model.  AR 7403.  Perplexingly, OCI also provided explanatory notes stating a total price of $199,464,082.04.  AR 7407.

The evaluation of the proposals was governed by the Source Selection Plan (the Plan), issued July 5, 2012, for the Solicitation.  AR 52.  The Plan provided for a Source Selection Authority (SSA), who would be the individual designated to make the ultimate best-value decision.  AR 81.  The SSA would be advised by a Source Selection Advisory Council (SSAC), who would represent specific functional areas from which the SSA would require expertise.  AR 82.  The performance of "a comprehensive review and evaluation of proposals against the RFP requirements and the approved evaluation criteria" was to be principally the task of a Source Selection Evaluation Board (SSEB).[6]  AR 84.  The Plan prescribed an adjectival rating scale – Outstanding, Good, Acceptable, Marginal, and Unacceptable – to be used to evaluate the Mission Capability and Small Business Participation factors.  AR 62.  It also provided, however, "To receive consideration for award, an offer must receive no less than an 'Acceptable' rating for the Mission Capability Factor and sub-factors."  AR 57.[7]

The Past Performance Factor would be evaluated via a relevancy rating – ranging from Very Relevant to Relevant, Somewhat Relevant, or Not Relevant.  AR 63.  An overall past performance confidence assessment rating would also then be assigned, ranging from Substantial Confidence to Satisfactory Confidence, Limited Confidence, or No Confidence.  *Id*.  The SSEB completed its report on September 7, 2012.  AR 5436 – 5545.

OCI's proposal received a rating of "Marginal" on Mission Capability.  AR 5494.  It received a "Good" rating on Small Business Participation.  AR 5505.

OCI's rating of "Marginal" on Mission Capability as a whole was reflected in similar "Marginal" ratings on both of the Mission Capability sub-factors.  On the first sub-factor, Overall Capability, the evaluators found "7 noted strengths" but that they were "insufficient to offset the increased risk inherent in" 11 noted weaknesses.  AR 5495.  The evaluation detailed these strengths and weaknesses in detail in the context of

---

[6]  One of the three members of the SSEB was Lt. Col. David Bringhurst, *see* AR 5436, who was also a participant in the meeting during which OCI was criticized by agency personnel for its handling of the Dr. Zeiger matter, according to the Post Meeting Report.

[7]  A "Marginal" rating was described as: "Proposal does not clearly meet requirements and has not demonstrated an adequate approach and understanding of the requirements.  The proposal has one or more weaknesses which are not offset by strengths.  Risk of unsuccessful performance is high."  AR 62.

the elements of Corporate Experience, Corporate Resources, Continuous Quality Improvement Plan, and Quality Control Plan.  For example, weaknesses in Corporate Experience were "the limited depth of similar experience presented" ("the only apparent behavioral health experience specifically being the previous ANG DPH contract"), failure to "articulate clearly how they were effective in developing a resolution, plan of action or tracking lessons learned," a "weak" description of corporate management (e.g., proposing email and weekly activity reports rather than simple conference calls), and reactive rather than proactive "identification and rectification of areas of risk." *Id.* Weaknesses under Corporate Resources were identified as the "lack of awareness of the benefits available to traditional Service Members" ("oversimplifying the spectrum of resources available and the need to address benefits on a case by case basis"), a limited provider network described as "a risk in terms of both the size of network and the direct access approach," and a data tracking and reporting methods plan viewed as "lacking substance" ("The offeror does not appear to understand the depth of scope for the requirement and proposes no behavioral health data elements under Subfactor One Corporate Resources").  AR 5496.

Two weaknesses were noted with respect to Continuous Quality Improvement: no plan "ready to be implemented" and failure to propose performance indicators.  These weaknesses suggested to the SSEB that "the plan is a textbook description with no tailored plan for the National Guard." *Id.* As to Quality Control, OCI merely described "roles and procedures in lieu of details" and, though citing Quality Control "metrics," failed to identify metrics specific to the National Guard. *Id.* at 5496-97.  It also made no mention of "Primary Source Verification." *Id.*

OCI was also given a rating of Marginal on sub-factor 2 regarding "Representative Tasks 1 & 2 – ANG & ARNG DPH Support Tasks" ("Representative Tasks").  AR 5500.  For this sub-factor, the proposal was to address the offeror's proposed solution to certain tasks, including such elements as its Task Execution Approach, Key Personnel, and Transition/Staffing Plan.  AR 70-71.  As with sub-factor 1, the SSEB itemized 12 weaknesses that were not offset by 6 noted strengths of the proposal.[8]  AR 5501-02.  For example, the evaluation board questioned OCI's population-based regional distribution plan because of its "potential to lead to confusion," its proposal for a "project charter" which risked "time lost toward implantation," an "ANG [-]centric Task Execution approach" which suggested a risk to ARNG task execution, its outline for Affiliate Liability Insurance demonstrating inadequate "understanding of the Mental Health field," its unfeasible approach to the availability of Traumatic Event Management response teams, and miscellaneous services too generic and not specific to ARNG.  In addition, the SSEB found that proposed ANG and ARNG Directors "do not meet the minimum requirements, did not find "sufficient depth" in OCI's plan for ARNG transition, and faulted the proposal's repeated "Wing" references as inapplicable to ARNG concerns.  AR 5500-01.  The evaluation concluded, "Overall, though the Board feels the offeror could potentially perform the required services, it

---

[8]  Although the opening paragraph of the SSEB "Supporting Rationale" for this sub-factor cited 6 strengths and 11 weaknesses, the itemization of weaknesses that followed the textual description numbered 12 weaknesses.  Compare AR 5500 with AR 5501-02.

would likely have significant issues during implementation and throughout performance, presenting a high risk to the Government."  AR 5501.

On Past Performance, however, OCI was given a rating of "Somewhat Relevant":

> Upon reviewing all three contracts submitted for past performance for offeror 09C4, there was relevancy in the ANG DPH contract covering one half of the Nation from a capability standpoint.  The other two contracts presented medical readiness/LOD determination which was somewhat relevant for a medical model but no specific experienced [sic] tied to a psychological health program was sited [sic] hence the overall rating of **Somewhat Relevant** for past performance.

AR 5503.

With respect to confidence assessment, OCI was given a "Limited Confidence" rating by the SSEB.  While the SSEB credited OCI with having provided "one example" of a project of similar scope, related to "mild adjustment disorders," it considered OCI's other two examples, relating to medical support services in general, physician deployment scheduling, and medical readiness support services, as not demonstrating "a behavioral health focus."  *Id.*  Furthermore, the SSEB noted, "Based on the offeror's recent/relevant performance record, the Government has a low expectation that the offeror will successfully perform the required effort."  *Id.*  The context of this SSEB comment is reflected in the additional observation in the report:

> However, one of the reviewers had prior experience with the offeror related to the ANG Psychological Health Program, and found the [sic] there were problems with project management and handling personnel, both of which are not accurate, as this company has struggled with meeting performance objectives and managing personnel.

*Id.*

These comments and the "Limited Confidence" rating clearly were based on the "Dr. Zieger matter" as it arose in the course of OCI's performance on the pilot project.

With respect to price, the Source Selection Plan established a Price Evaluation Team (PET) charged with providing a Price Analysis to the SSAC and to the Source Selection Authority.  AR 5546, 5571.  The PET evaluated each offeror's TCLP and determined "whether the Offerors have completed all aspects of the price proposal properly and whether the amounts listed in the price proposal are calculated accurately."  AR 5547.  The price evaluation process did not employ adjectival ratings.  *Id.*  The steps involved included a comparison of each offeror's total price with other offeror's proposed

prices, comparison with the agency's own Independent Government Cost Estimate (IGCE), review of each proposal for completeness, reasonableness, and realism, and consideration of any other significant items of concern.  AR 5548.

OCI's proposal was judged complete, but that "additional notes which could not be interpreted were included on the worksheets and the offeror added additional Emergency Affiliate Provider (EAP) costs to the firm-fixed price for DPH services."  AR 5555.  The PET did not adjudge OCI's proposal as "fair and reasonable when compared to other prices received" in response to the RFP.  It noted in particular that OCI's TCLP of $265,619,111.06 was the "highest proposed": 37.36% above the government estimate and 51.17% above the average of all the offerors.  *Id.*  OCI's prices were not determined to be unrealistic, but that its "extremely high price and labor rates may reflect an unclear understanding of the requirement."  *Id.*

The SSAC reported that OCI in effect had taken "exception" to the Government's price model, but that the PET had "verified the propriety of all formulas in the submitted price model and found that the calculated price of $265,619,111.06 was determined on the same basis as all other offerors' TCLP and therefore the only valid figure for evaluation."  AR 5701.  Furthermore, the SSAC advised, albeit merely summarily, that "if the Government were to consider all offerors based on a similar construct to that used by [OCI], its price would still be the highest evaluated."  *Id.*  It concluded,

> Whether this offeror's evaluated price was $199,464,082.04 or $265,619,111.06 makes no difference in the recommendation to exclude the offeror from the competitive range, as the offerors [sic] rating of 'Marginal' for Factor 1, and the constituent discriminators on which this rating was based could not be mitigated by even the lower price the offeror specified.

*Id.*

The SSAC recommended that a competitive range be established limited only to the four most highly rated proposals, "each of which was rated 'Good' or above for Factor 1," Mission Capability, which was the most important of all the ratable factors.  *Id.*  "Here a clean break exists between the most highly rated proposals and those not among the most highly rated.  Furthermore as the acquisition strategy states an intended target of 2-3 awardees, the 4 most highly rated proposals represent an efficient quantity at which competition may be conducted and awardees selected."  *Id.*  Goldbelt, Intervenor-Defendant in the case at bar, was one of the four offerors whose proposals were deemed to fall within the competitive range.  AR 5752.

On September 17, 2012, OCI was informed by letter that its proposal was determined to fall outside the competitive range.  AR 6815.  On September 20, 2012, OCI filed a bid protest at the Government Accountability Office (GAO) protesting its exclusion from the competitive range.  AR 6384.  OCI alleged that the NGB's had based

its determination on "erroneous pricing information." AR 6389. "The Agency claimed that the price quoted by OCI was for $265,619,111.06. This is false. In actuality, the OCI price expressly quoted and submitted to the Agency for review was $199,464,082.04." AR 6390. OCI blamed the NGB's "malfunctioning pricing spreadsheet" and the agency's failure to credit the explanation that OCI had provided in its submission. *Id.*

GAO denied OCI's protest on December 28, 2012. AR 6427. It noted that OCI had submitted multiple total prices, but that "the agency reasonably evaluated Optimization's price proposal in a manner consistent with the RFP." AR 6434. The agency had explicitly advised that an offeror's TCLP would be evaluated "based only" on the price model and that, despite OCI's assertion that the price model contained formula errors, "the protester has not identified any such errors or shown how its final revised $266 million price was miscalculated." *Id.* The GAO decision also addressed OCI's challenges to the NGB's evaluation of its proposal under the mission capability factor (apparently raised in a supplemental protest[9]). AR 6435. "We find that [Optimization's arguments] largely reflect the protestor's disagreement with the agency's technical evaluation, and offer no basis to sustain the protest." *Id.*

> Although the protester may disagree with the agency's evaluation of its mission capability proposal, the record demonstrates that the SSEB and the CO considered all of the information submitted by offerors and available to the agency, and issued a well-reasoned and rational evaluation report and competitive range determination that extensively highlighted key discriminators between Optimization's and other offerors' proposals.

AR 6436.

The GAO decision concluded, "In sum, Optimization has not shown that the agency's evaluation of its price and mission capability proposals was unreasonable or inconsistent with the RFP, and the protestor's disagreement with the agency's judgment does not establish that the agency acted unreasonably." AR 6437.

II.    Legal Standards

A.    Standing

The Court of Federal Claims has jurisdiction under the Tucker Act to render judgment in actions by an interested party challenging the award of a contract in connection with a procurement. 28 U.S.C. § 1491(b)(1); *EREH Phase I LLC v. United States*, 95 Fed. Cl. 108, 112 (2010). In its cross-motion for judgment on the AR,

---

[9] Although OCI's supplemental protest to GAO raised a challenge to the NGB's evaluation on mission capability, it evidently did not challenge before the GAO, unlike here, its rating on past performance. AR 6435, n.18.

however, the Government argues that the court lacks jurisdiction to entertain Plaintiff's complaint because Plaintiff lacks standing to bring its protest. Standing is clearly a "threshold" jurisdictional requirement. *Myers Investigative and Security Services, Inc., v. United States*, 275 F.3d 1366, 1369 (Fed. Cir. 2002). Furthermore, "[t]he party invoking federal jurisdiction bears the burden of establishing [the] elements [of standing.]" *Id.* (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).

"In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute . . ." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). The reason for this threshold inquiry is to respect "both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise." *Id.* There are three elements of standing: 1) a plaintiff must show that it has suffered an "injury in fact" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical"; 2) injury must be "fairly traceable" to the action of the defendant; and 3) "it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Magnum Opus Techs., Inc. v. United States*, 94 Fed. Cl. 512, 528 (2010) (citing *Friends of the Earth, Inc. v. Laidlaw Envtl. Serv., Inc.*, 528 U.S. 167, 180-81 (2000). The requirement of standing on a bid protest in the Court of Federal Claims, however, is even more particular. "In this court, plaintiffs face the further hurdle of statutory standing." *Magnum Opus*, 94 Fed. Cl. at 529.

Under the Administrative Dispute Resolution Act, plaintiffs in bid protest actions are limited to those who are actual or prospective bidders and who can demonstrate that they possess "a direct economic interest." *Id.* (quoting *Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1307 (Fed. Cir. 2006). The showing of "direct economic interest" amounts to a showing of prejudice. "[T]he Federal Circuit has construed the second element, the 'direct economic interest' prong, to mean that a successful protestor must also establish that the errors complained of caused prejudice." *Textron, Inc. v. United States*, 74 Fed. Cl. 277, 283 (2006). The hurdle is not trivial. "[A] bid protester must have a substantial chance of receiving an award in order to have an economic interest in it and therefore standing to file a bid protest." *Labatt Food Service, Inc. v. United States*, 577 F.3d 1375, 1379 (Fed. Cir. 2009).[10]

The court in *Textron* noted that the prejudice standard is not only an element of standing (which is a non-merits-based inquiry, *see Media Techs. Licensing, LLC v. Upper Deck Co.*, 334 F.3d 1366, 1370 (Fed. Cir. 2003)), but also a required showing in a later stage, merits-based determination warranting injunctive relief. *Textron*, 74 Fed. Cl. at 284.[11]  It cautioned accordingly against "a round-robin through the arguments on the merits in order to resolve a jurisdictional issue. Such is not a desirable or appropriate

---

[10]  The court notes that decisions in this court and in the Federal Circuit have variously referred to plaintiffs in bid protests as "protesters" or "protestors." This court will employ the latter spelling, except where citing the former in a quotation.

[11]  "This court thus looks twice at prejudice, first weighing prejudice as it pertains to standing, and then more thoroughly weighing prejudice to determine whether a plaintiff shall be afforded relief." *L-3 Global Comunications Solutions, Inc. v. United States*, 82 Fed. Cl. 604, 608 n.4 (2008).

procedure." *Id.* at 284-85.[12]  To thread its way carefully through this dual-stage inquiry, it adopted an approach to standing focusing on the status of the protestor and avoiding the parties' arguments on the merits: a protestor would have standing only if it was

> (1) either a bidder or proposer that has been prevented from bidding or proposing due to some infraction other than the terms of the solicitation itself; or (2) either a bidder or proposer who would be *in contention* absent an unreasonable procurement decision or violation of applicable procurement regulations.

*Id.* at 285 (emphasis added).  *Accord Bilfinger Berger AG Sede Secondaria Italiana v. United States*, 97 Fed. Cl. 96, 135 (2010).

        In a similar vein, the court in *Night Vision Corp. v. United States*, 68 Fed. Cl. 368, 391, 392 & n. 23 (2005), characterized the prejudice inquiry for purposes of assessing standing as a "limited review" in search of the "minimum requisite evidence" of injury to a protestor's "substantial chance of obtaining the contract, assuming that the protestor's substantive allegations bear out."  Nevertheless, if, despite the alleged procurement error, the protestor would still not have been "in contention" or still had a "substantial chance" of obtaining the contract, then the protestor has not been prejudiced and lacks standing.  "Without a showing of harm specific to the asserted error, there is no injury to redress, and no standing to sue."  *Labatt*, 577 F.3d at 1381.

        Another approach to viewing the two distinct applications of the prejudice inquiry was addressed in *L-3 Commc'ns Corp. v. United States*: "The difference between the two [prejudice standards] is that the prejudice determination for purposes of standing assumes all non-frivolous allegations to be true, whereas the post-merits prejudice determination is based only on those allegations which have been proven to be true."  *L-3 Commc'ns Corp. v. United States*, 99 Fed. Cl. 283, 289 (2011).

        In Plaintiff's motion for judgment on the administrative record, the gravamen of its complaint is that the NGB erred in its evaluation of OCI's proposal with respect to: 1) price ("the Government's reliance on the artificially inflated $265,619,111.06 'price' is thus improper," Pl.'s Mot. at 1) and 2) past performance ("The Agency's past performance evaluation is not reasonably supported by the record, nor is it in accordance with the Solicitation's evaluation criteria," *id*. at 18).  OCI further alleges that its past performance evaluation was "skewed" by the agency's animus towards OCI relating back to the Dr. Zeiger matter during the pilot project.  *Id*. at 1, 26-28.

---

[12]  The court in *Magnum Opus* similarly observed that, because a plaintiff's failure to establish standing precludes a ruling on the merits, the corollary is that a plaintiff cannot be required "to prove the merits of its case in order to demonstrate standing."  *Magnum Opus*, 94 Fed. Cl. at 530 n.12.  In *Archura LLC v. United States*, on the other hand, the court observed, "In some cases, however, the analyses become intertwined, such that consideration of the merits will relate back to the initial standing inquiry."  112 Fed. Cl. 487, 497 (2013) (citing *Comint Sys. v. United States*, 700 F.3d 1377, 1384 (Fed. Cir. 2012).

B.  Bid Protest Standard of Review

Under the Tucker Act, the Court of Federal Claims reviews the agency's decision in a bid protest "pursuant to the standards set forth in section 706 of title 5" of the Administrative Procedure Act (APA) (5 U.S.C. §§ 551-559, 701-706).  28 U.S.C. § 1491(b)(4).  Under the APA, the inquiry is whether the agency's action is "arbitrary, capricious, an abuse of discretion, or otherwise contrary to law" or "without observance of procedure required by law."  5 U.S.C. § 706(2).  The Federal Circuit has described the standard of review as whether the procurement decision "lacked a rational basis" or "involved a violation of regulation or procedure."  *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001); *see also Med. Devel. Int'l, Inc. v United States*, 89 Fed. Cl. 691, 700 (2009).  For a determination whether the decision had a rational basis, the scope of review is narrow: "The Court will look to see if an agency 'examine[d] the relevant data and articulate[d] a satisfactory explanation for its action."  *Gulf Group Inc. v. United States*, 61 Fed. Cl. 338, 351 (2004) (quoting *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 20, 43 (1983).  When the protest alleges a violation of regulation or procedure, the disappointed bidder must show that the violation was "clear and prejudicial."  *Impresa*, 238 F.3d at 1333.

The protestor bears a "heavy burden" of showing that the award decision had no rational basis.  *Id*.  The burden is even higher in a "best value" procurement. "Procurement officials have substantial discretion to determine which proposal represents the best value for the government."  *E. W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996); *Galen Med. Asso., Inc. v. United States*, 369 F.3d 1324, 1330 (Fed. Cir. 2004) ("the contracting officer ha[s] even greater discretion than if the contract were to have been awarded on the basis of cost alone").   "And in cases such as this, when a negotiated procurement is involved and at issue is a performance evaluation, the greatest deference possible is given to the agency – what our Court has called a 'triple whammy of deference."  *Gulf Group*, 61 Fed. Cl. at 351 (citing *Overstreet Electric Co. v. United States*, 59 Fed. Cl. 99, 117 (2003)).

Procedurally, the court proceeds in "two steps."  *Bannum, Inc. v. United States*, 404 F.3d 1346, 1351 (Fed. Cir. 2005).  "First . . . the trial court determines whether the government acted without rational basis or contrary to law when evaluating the bids and awarding the contract.  Second . . . if the trial court finds that the government's conduct fails the APA review . . . then it proceeds to determine, as a factual matter, if the bid protester was prejudiced by that conduct."[13]  *Id*.  In a post-award bid protest, such as here, the plaintiff must demonstrate that the errors in the procurement process "significantly prejudiced" it.  *Id*. at 1353.  "To establish 'significant prejudice' [the plaintiff] must show that there was a 'substantial chance' it would have received the contract award but for the errors . . ."  *Id*. (citations omitted).

Pursuant to Rule 52.1(b) of the Rules of the Court of Federal Claims (RCFC), the court considers the parties' cross-motions for judgment on the administrative record as

---

[13]  This is the second, merits-based prejudice inquiry to which the court referred in *Textron*, supra.

"akin to an expedited trial on the paper record." *L-3 Global Commc'ns Solutions, Inc.*, 82 Fed. Cl. 604, 608 (2008). The court inquires whether a party has met its burden of proof, and makes fact determinations as necessary, based on the existing administrative record. *Id.* at 607-608; *Bannum*, 404 F.3d at 1356.

III.    Discussion

   A.  Supplementing the Administrative Record

Underlying much of OCI's complaint and motion for judgment is its allegation that OCI's past performance rating "appears to be entirely based on OCI's decision to terminate one of its employees, Ms. Zeiger, who was apparently a former colleague and friend of members of the evaluation team, rather than any issues with OCI's actual performance under the [pilot] contract." Pl.'s Mem. at 20. OCI asserts that its evaluation was "improperly skewed" by Lt. Col. Bringhurst's "affinity towards" Dr. Zeiger, *id.* at 1, complains of a "lack of objectivity," "personal animosity," and "Government ill-sentiment" that operated "to the prejudice of OCI," *id.* at 2, and accordingly argues that the Government violated the implied covenant of good faith and fair dealing to which it is bound in evaluating a bidder's proposal. *Id.* at 28.

In addition, OCI complains that the utilization by the NGB of a contract employee, Karen Klepadlo, to assist in the Solicitation "tainted the entire procurement process" in favor of Goldbelt Glacier. Pl.'s Mem. at 29-30. Ms. Klepadlo is an employee of Alutiiq, a subsidiary of Afognak Native Corporation, an Alaskan Native Corporation (ANC).[14] Prior to her employment with Alutiiq, she had worked for TCoombs & Associates, LLC, whose website identifies Goldbelt Wolf as one of its "Manufacturer and Security Services Partners." Pl.'s Mem. at 29; Def.'s Mot. at 27. Goldbelt Wolf is a "sister-company" of Goldbelt Glacier, the Intervenor-Defendant here, as both are subsidiaries of a parent company, Goldbelt, Inc. Among other assignments, Ms. Klepadlo assisted Capt. Joan F. Hunter, the Chair of the SSEB, AR 2, and prepared the Independent Government Cost Estimate. AR 5547. OCI alleges that actions of Ms. Klepadlo "compromised the integrity of the procurement and caused OCI irreparable harm as key employees were encouraged to move to OCI's competitors <u>before</u> an award determination had even been made," Pl.'s Mem. at 29, referring to an email that Ms. Klepadlo sent out on July 30, 2012, for distribution to "State and Wing DPH Program" personnel. AR 6609-10.

In support of the allegations of bias against OCI, OCI filed what it described as a "Declaration of Harm," Docket # 29, a declaration of its Chief Operations Officer, Richard Holmes, executed April 22, 2013 ("the Holmes Declaration"), subsequent to the filing of its amended complaint and prior to the filing of its motion for judgment on the administrative record. On April 29, 2013, OCI filed a motion for leave to file various attachments that had been referenced in, but not included with, the Holmes Declaration. These attachments, Docket # 30, consisted of a resume of Dr. Zeiger, an internal OCI

---

[14]  Neither Alutiiq nor Afognak were offerors for the solicitation at issue here.

memo to Dr. Zeiger placing her on probation in November 2011, a string of emails to and from Dr. Zeiger referencing "glitches" regarding insurance coverage in the pilot program, and the Post Meeting Report, that is, OCI's summary of a meeting held May 29, 2012, to discuss the "way ahead, concerns and plans after termination of Dr. Zeiger."

In its cross-motion and response to OCI's motion for judgment on the AR, Defendant also submitted extra-record materials specifically with respect to OCI's complaints about the role of Ms. Klepadlo because "OCI now attempts to draw a connection between Ms. Klepadlo and [Goldbelt Glacier]." Def.'s Mot. at 27. These materials included a statement from Alutiiq, the NGB contracting officer's determination that there was no potential for an organizational conflict of interest, a declaration of Ms. Klepadlo, Ms. Klepadlo's resume, an Alutiiq Employee Confidentiality Agreement and Code of Ethics and Business Conduct Responsibility Statement (both signed by Ms. Klepadlo), and the email message sent by Ms. Klepadlo for distribution to the "State and Wing DPH Program" managers and points of contact regarding the Solicitation process. In the email message, Ms. Klepadlo wrote:

> The intent is to educate our staff members on the contracting and transition process and to offer a forum for communication regarding any concerns they may have regarding the upcoming contract award. . . As you may know, a Solicitation has been released . . . I invite each of you to familiarize yourselves with the Solicitation process. . . It is good business practice that current staff members in good standing will be offered 'First Right of Refusal' for the position which they currently hold, should a new company win the contract award. I do however, encourage you to visit the interested vendor's websites and apply on their career pages for your position of interest. This aids the transition process along and ensures that each company knows that you have an ongoing interest in a position with the program.

AR 6609-10.

Generally, as the Federal Circuit has noted, "'the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court.'" *Axiom Resource Management, Inc. v. United States*, 564 F.3d 1374, 1379 (Fed. Cir. 2009) (quoting *Camp v. Pitts*, 411 U.S. 138, 142 (1973)). In *Axiom*, it was emphasized that the reviewing court is tasked with applying Administrative Procedure Act standards to the agency decision "based on the record" presented by the agency. *Id.* "The purpose of limiting review to the record actually before the agency is to guard against courts using new evidence to 'convert the "arbitrary and capricious" standard into effectively de novo review.'" *Id.* at 1380 (quoting *Murakami v. United States*, 46 Fed. Cl 731, 735 (2000), *aff'd*, 398 F.3d 1342 (Fed. Cir. 2005).

Accordingly, supplementation of the administrative record should only be allowed in circumstances where "'the omission of extra-record evidence precludes effective judicial review.'" *Id.* The Federal Circuit elaborated that supplementation may be warranted "if the existing record is insufficient to permit meaningful review consistent with the APA." *Id.* at 1381. One example of an insufficient record would be where there is a "strong showing or bad faith or improper behavior" by agency officials such that "effective judicial review" requires "examining the examiners themselves." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971), overruled on other grounds by *Califano v. Sanders*, 430 U.S. 99 (1977). Applying these considerations, the Court of Federal Claims has appropriately reasoned that supplementing the AR may be necessary in order to prove wrongdoing by an agency:

> Allegations of bias, prejudice and bad faith . . . which depend upon a Government official's past conduct toward a bidder necessarily cannot be subsumed within the record of a challenged award decision.

*Int'l Res. Recovery, Inc. v. United States*, 61 Fed. Cl. 38, 41-42 (2004).

Such allegations of bias and prejudice, however, cannot rest merely on "argument, suspicion, or conjecture." *Office Depot, Inc. v. United States*, 94 Fed. Cl. 294 (2010). Absent a threshold showing, "a plaintiff[']s bare allegations of bad faith are insufficient to place the issue or the proffered extra-record evidence before the court." *Id.* at 297 (quoting *Madison Servs., Inc. v. United States*, 92 Fed. Cl., 120, 130 (2010). Rather, courts have described the required threshold determination as that of being "well grounded," *L-3 Comm. Integrated Sys. v. United States*, 91 Fed. Cl. 347, 354 (2010), "a reasonable factual predicate," *id.* at 355, "an evidentiary foundation," *Pitney Bowes Gov't Solutions, Inc. v. United States*, 93 Fed. Cl. 327, 332 (2010), or "a strong evidentiary footing," *Beta Analytics Int'l, Inc. v. United States*, 61 Fed. Cl. 223, 226 (2004) ("to put facts relating to bad faith in play a plaintiff must first make a threshold showing of either a motivation for the Government employee in question to have acted in bad faith or conduct that is hard to explain absent bad faith").

The decision on supplementation is distinct from a decision on the merits of the allegation of bias. "The burden of proof required for supplementing the administrative record is lower than that required for demonstrating bad faith or bias on the merits." *Pitney Bowes*, 93 Fed. Cl. at 332. As noted, the test for supplementation is "whether there are sufficient well-grounded allegations of bias to support an inquiry." *Id.* On the other hand, to overcome an agency decision's presumption of good faith, "the proof must be almost 'irrefragable.'" *Spezzaferro v. Fed. Aviation Admin*., 807 F.2d 169, 172 (Fed. Cir. 1986).

The thrust of OCI's allegation of bias is that NGB personnel had an affinity in favor of Dr. Zeiger, alleging that she "was apparently a former colleague and friend of members of the evaluation team," Pl.'s Mem. at 20, developed an "animosity," *id.* at 2,

against OCI because OCI had replaced Dr. Zeiger in the pilot project, and that the Government's "ill-sentiment carried over into the evaluation of OCI in the instant Solicitation." *Id.* The Holmes Declaration recites that the agency had suggested that OCI hire Dr. Zeiger to replace OCI's original National Director of Psychological Health whom the Government had directed be removed by OCI three months into the pilot program (and alleges that "an extensive personal history" existed between Dr. Zeiger and an agency contracting official, Col. Jane Klingenberger); that OCI had thereafter documented several incidents of Dr. Zeiger's poor judgment, including one in which OCI alleges Dr. Zeiger stated in a regional conference call, "I do not think OCI should get the new contract and I will see to it that they don't"; that OCI had terminated Dr. Zeiger after having placed her on a performance improvement plan; that the agency had convened a meeting with OCI to discuss Dr. Zeiger's termination; and that during the meeting, Col. Jane Klingenberger "threatened" OCI, stating that OCI "should not be surprised to one day be working for Dr. Zeiger." Mr. Holmes avers that OCI construed Col. Klingenberg's statement as a threat to OCI bid for an award under the instant Solicitation. The Holmes Declaration also asserts that "[a] true copy of the meeting minutes is included at Attachment 2."

The "minutes" referenced in the Holmes Declaration are the "Post Meeting Report," compiled by OCI. The Report recites the date of May 29, 2012, although it is uncertain whether that date is the date of the meeting or the date on which the account of the meeting was compiled. The Report first lists the meeting participants, including, among others, Mr. Holmes, Lt. Col. Bringhurst, and Col. Klingenberger; it then provides what is described as "Meeting Minutes"; and it concludes with a listing of "Outstanding Action Items." The court notes that there is no indication of who took notes of the meeting or whether the meeting was recorded or when the "minutes" were compiled. Despite the description of the meeting discussion as "minutes," there is no indication that they were ever even seen prior to this litigation by the NGB, much less whether the NGB ever agreed with this account, despite a selection of boxes of the Report to indicate "Approved," "Disapproved," or "Pending."[15] Yet the Holmes Declaration describes them as a "true copy of the meeting minutes."

The "minutes" recite that "Col Klingenberger stated that OCI should have submitted a Contingency Plan prior to terming [sic] Zeiger. This could not have come at a worse time." "Col. Klingenberger advised Mr. Holmes that he was "Not earning any brownie points with the ANG, as it seemed he was 'Throwing Dr. Zeiger under a bus.'" "Col. Bringhurst expressed that the ANG did not know Ms. Zeiger was on a Performance Improvement Plan and they should have been notified." "Col. Klingenberger stated that the ANGRC is the customer, and they should have been made aware of decision. She stated that OCI should not be surprised to run into Ms. Zeiger again. Ms. Zeiger may come back in a Government Position, and OCI will be working for her. If this happens, it will be a direct result of how OCI went about terminating Ms. Zeiger." "Col. Klingenberger advised that Zeiger has been of great assistance to her personally." "Col.

---

[15] As a term under parliamentary law, "minutes" is defined in Black's Law Dictionary as "[t]he formal record of a deliberative assembly's proceedings, approved (as corrected, if necessary) by the assembly." *Black's Law Dictionary* 1018 (8th ed. 2004).

Staresina clarified that he had no attachment connection to Ms. Zeiger.  His statements were to emphasize the importance of notifying the client when replacing Key Personnel." "Col. Klingenberger advised that . . . switch of PM has to be choreographed to make for a 'win win' situation for the government.  Although it appears Ms. Zeiger was causing internal issues that the government was not experiencing."  "Col. Klingenberger stated that the reason we were 'beating that dead horse' is that we have 90 people showing at the Readiness Frontiers and a Secretary of Defense; Zeiger is well regarded among many of the 90 personnel on the contract . . . perhaps not all of the personnel were as fond of Ms. Zeiger as previously thought.  She also stated that in light of the new information provided, Ms. Zeiger might not be reappearing in a Government capacity."  "Col. Bringhurst reiterated that it was a huge disappointment because the termination came out of the blue; overall, Ms. Zeiger's work was stellar; the ANG had no concept that her leadership may have impacted the other terminations; all they saw was stellar work." "Col. Klingenberger stated . . . From her perspective, most of the OCI DPH's trusted Dr. Zeiger and it is going to be a 'blow to them.'"

The immediate question before the court with respect to supplementation of the Administrative Record by the addition of the Holmes Declaration and the Post Meeting Report is whether they are necessary to inform the court's consideration of OCI's claim of bias in order to achieve effective judicial review.  The Dr. Zeiger matter certainly played a role in the evaluation of OCI's past performance by the SSEB.  The court finds that, taken at face value, the so-called minutes suggest a sufficiently reasonable factual predicate for OCI's claim, at the very least to support the court's inquiry and to warrant allowing the documents as a supplement to the AR.

To the same extent, the court is persuaded in favor of allowing Defendant's proposed extra-record evidence with respect to the role of Ms. Klepadlo vis-à-vis OCI's claim that her participation as a contractor for the agency effected an improper "taint" in favor of Goldbelt Glacier.

Accordingly, the court will consider all of these documents in its review of the merits of Plaintiff's procurement protest.

B.  The Government's Argument on Standing

The Government argues that OCI lacks standing to protest its exclusion from the competitive range for two reasons.  First, with respect to price, it argues that, by failing to file a pre-award protest against the price model set forth in the Solicitation, OCI has "waived any objection to the NGB's use of the solicitation's price model to calculate and evaluate the total price that the NGB would consider in evaluating" bidders' proposals. Def.'s Mot. at 9.

Second, it argues that OCI's failure to contest the "marginal" rating it received as to Factor I, Mission Capability, or either of its sub-factors, Overall Capability (sub-factor 1) and Representative Tasks (sub-factor 2), rendered its proposal as not being within the competitive range.  *Id*. at 12.  By virtue of its elimination from the competitive range on

this basis alone, given the requirement that "[t]o receive consideration for award, an offer must receive no less than an 'Acceptable' rating for the Mission Capability Factor and sub-factors," AR 57, "OCI cannot meet its burden to establish that, but for specific errors, it had a 'substantial chance' of winning the contract." Def.'s Mot. at 12. Accordingly, the Government argues, "OCI thus would have still been excluded from the competitive range even if the NGB had calculated OCI's price in the manner that OCI now contends the solicitation required." *Id.* at 13 (citing AR 5883-84).

    1.  Price

    As the Government argues, the gravamen of OCI's complaint regarding price is its objection to the NGB's use of a price model, specifically the calculation of its TCLP, rather than what OCI considers the more meaningful price based on "the probable cost." *See* Pl.'s Mem. at 14 (citing AR 991-92). Plaintiff avers that "the pricing model . . . does not accurately reflect what the Government will actually pay." *Id.* at 15. Thus, because the pricing model "is based on ceiling pricing for each labor category that fails to consider the pricing actually proposed," OCI's TCLP of $265,619,111.06 did not constitute "the probable cost to the Government." *Id.* at 1.

    OCI's explanation for the disparity of its "overstated" TCLP of $265 million compared to its "correct" total price of $199 million is that the agency's price model used "ceiling rates" to calculate the total price, "causing a calculation error drastically skewing OCI's proposed quote." *Id.* at 8. OCI contends that the ceiling rates, however, "were applicable to only the highest cost of living areas in the country and were not intended as a universal rate to be applied across the entire contract." *Id.*

    In effect, then, the Government is correct in characterizing OCI's position as a concession that the NGB properly calculated OCI's total price utilizing the price model. The Government reasons that the Solicitation manifestly provided that the NGB would evaluate offerors' proposals based upon "total contract life price to be determine[d] based upon the price model set forth reflecting the proposed prices for the two sample tasks, the fixed-price contract line items (CLIN), and the ceiling (or maximum) hourly rates for seven required labor categories." Def.'s Mot. at 10. Accordingly, the Government argues that OCI's failure to protest the terms of the Solicitation waives any present objection based on price.

    In *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1313 (Fed. Cir.), the court held that "a party who had the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest action in the Court of Federal Claims." The court recognized analogous doctrines of laches and equitable estoppel in developing its waiver rule:

            In the absence of a waiver rule, a contractor with
            knowledge of a solicitation defect could choose to stay
            silent when submitting its first proposal. If its first

> proposal loses to another bidder, the contractor could then
> come forward with the defect to restart the bidding process,
> perhaps with increased knowledge of its competitors. A
> waiver rule thus prevents contractors from taking
> advantage of the government and other bidders, and avoids
> costly after-the-fact litigation.

*Id.* at 1314.

In other words, "'[v]endors cannot sit on their rights to challenge what they believe is an unfair solicitation, roll the dice and see if they receive award [sic] and then, if unsuccessful, claim the solicitation was infirm.'"" *Id.* (quoting *Argencord Mach. & Equip., Inc. v. United States*, 68 Fed. Cl. 167, 175 n.14 (2005).

Yet it is plain that OCI submitted two vastly different price totals, then sat on its hands awaiting whether it would be successful in its bid in any event. As Defendant points out, the Solicitation plainly provided that offerors' proposals would be evaluated based on the TCLP, which in turn was to be based on the price model "reflecting the proposed prices for the two sample tasks, the fixed-price contract line items (CLIN), and the ceiling (or maximum) hourly rates for seven required labor categories." Def.'s Mot. at 10; AR 1991-02, RFP amend. 2, at 73-74; *see also* AR 827-28, RFP amend. 5 at 2-3. Sample Task 1 required offerors to submit labor rates for numerous geographical locations. AR 3373.

When OCI first submitted its proposal on August 9, 2012, its TCLP was $196,662,107. AR 3378. Subsequently, the agency issued Amendments 5, 6, and 7 dealing with revisions to the price model. OCI inquired about the permissibility of "recalculating and resubmitting a new price quote," rather than being bound by the price it had quoted earlier. AR 842. The agency's response was that offerors were "permitted to recalculate pricing as they see fit," but were advised "to ensure proposed prices" complied with the requirements of recently provided amendments. *Id.* One of the recent instructions had introduced the opportunity of providing "explanatory pricing notes" on a separate PDF document, but cautioned that the pricing notes were to "be limited to explanations of details not readily discernible from the price model and shall not contain qualifications or options which could result in a change of price." AR 828. Further, the "Pricing Notes" guidance reemphasized that "the price model and the TCLP calculated by the price model will be the only price evaluated." *Id.*

The import of these instructions is that OCI was on notice that 1) it could revise its originally submitted price quote, but only consistent with the price model as amended and 2) that it could provide explanatory notes, but the notes could not "qualify" or otherwise change its TCLP per the price model. OCI's submission of different TCLP totals, one in the price model and the other in its notes, was contrary to these instructions. OCI essentially acknowledges as much ("As directed by the Agency, this information was intended to explain the errors in the spreadsheet as submitted," Pl.'s Mem. At 9), but posits simply that it didn't expect that the Government would nevertheless "ignore" its

pricing notes. Pl.'s Resp. to Def.'s Mot. for J. on the AR and Reply to Def.'s Resp. to Pl.'s Mot. for J. on the AR ("Pl.'s Resp. and Reply") at 12. "Given the significance [sic] difference between the pricing generate [sic] by the pricing model, and that offered by OCI reflecting probably cost to the Government, OCI reasonably assumed that prior to the submission of proposals that the Government would consider OCI's intended and actual pricing." *Id.*

To the extent, then, that the substance of OCI's complaint focuses on the alleged disparity between the price model's specific formulation of the TCLP and the more generic "probably cost to [the] Government as required by the evaluation criteria," Pl.'s Mem. at 16, OCI should have raised its concern prior to the close of the bidding process. Furthermore, OCI mistakenly fixates on "probable cost" in alleging that the price model failed to take into account labor rates based on geographical regions, relying instead on ceiling rates for several labor categories. OCI's reliance on its alternative "probably cost" price calculation is bewildering, however, because the price amendments were pellucid in stating that the TCLP calculated via the price model would be the *only* price evaluated.[16]

The court finds, per the caveat established by the Federal Circuit in *Blue and Gold Fleet*, that OCI has waived its objections based on price because of its failure to have challenged the price model and its instructions regarding the TCLP prior to the final bid submission deadline.

## 2.  Mission Capability

The Government argues that, even if the court were to find that OCI has not waived its objections based on price, it would nonetheless have been excluded from the competitive range based on its deficient ratings under the Mission Capability factor and its two subfactors. The Government elaborates that OCI's rating of Marginal as to Factor 1, in comparison to the Good or Outstanding ratings of the companies within the competitive range, by itself eliminated OCI from having a substantial chance of winning the contract. Def.'s Mot. at 12. Thus, in not challenging its Mission Capability rating, OCI cannot demonstrate standing to pursue other allegations of error in the award of the contract. *Id.*

It is correct that OCI has focused on issues of price and past performance, rather than mission capability factor per se, in its motion for judgment on the record. Yet, while mission capability was the foremost of all the factors in importance, OCI is generally persuasive in noting that "Mission Capability requirements fall squarely within information challenged by OCI on its past performance and corporate experience." Pl.'s

---

[16]  The SSAC report also noted that the Price Evaluation Team had "verified the propriety of all formulas in the submitted price model and found that [OCI's] calculated price of $265,619,111.06 was determined on the same basis as all other offerors' TCLP and therefore the only figure for evaluation." AR 5701. It also noted, although without elaboration, that, even "if the Government were to consider all offerors based on a similar construct to that used by [OCI in its explanatory notes' TCLP], its price would be the highest evaluated." *Id.*

Resp. and Reply at 14.  The allegations of prejudice, ill-sentiment, and animosity towards OCI as a result of the Dr. Zeiger matter, albeit addressed in OCI's motion under the rubric of past performance, also potentially implicate the ratings it received relating to corporate experience and key personnel, elements of sub-factors 1 and 2, respectively.

In this respect, therefore, OCI has indeed effectively questioned its Mission Capability ratings, sufficiently so that the court cannot conclude that Plaintiff has waived its opportunity to argue on the merits in this respect.

C.  Past Performance

OCI's claim is founded on its perception that the NGB's unhappiness over the termination of Dr. Zeiger prejudicially impacted the evaluation of OCI's past performance (as suffused in both the Mission Capability and Past Performance factors) with respect to the instant solicitation.

The Solicitation advised that "The Government will evaluate past performance of three (3) current or previous contracts for relevancy based on how well the contractor performed on projects of similar dollar value, scope, and complexity."  AR 975.  It also stated, "Offerors are advised that the Government may use past performance information obtained from centralized past performance databases *and sources other than those identified by the offeror . . . .*"  *Id.* (emphasis added).

According to the SSEB report, OCI's three past performance submissions were "one example of a similar scope which addressed mild adjustment disorders, associated personal problems of SM [service members] related to deployment conditions which adversely impacted reintegration to civilian life," and two examples "highlight[ing] medical support services, physician deployment scheduling, and medical readiness support services, none of which demonstrated a behavioral health focus."  AR 5503.

Based on the three past performance submissions, the SSEB gave OCI a "Limited Confidence" rating "due to the lack of ARNG DPH program experience."  *Id.*  It stated that, "[b]ased on the offeror's recent/relevant performance record, the Government has a low expectation that the offeror will successfully perform the required effort."  *Id.*  Of most significance was the SSEB's evident disagreement with the past performance ratings by the contracting officer for the past jobs to the effect that the past work, as summed up by the SSEB, "was accomplished with minor problems and exceeded many requirements."  *Id.*  Instead, the SSEB reported:

> However, one of the reviewers had prior experience with the offeror related to the ANG Psychological Health Program, and found the [sic] there were problems with project management and handling personnel, both of which are not accurate, as this company struggled with meeting performance objectives and managing personnel. Furthermore they failed to keep the government informed

> on key personnel decisions, firing the National Director of
> Psychological Health without prior warning to the ANG, to
> include no notification that the employee was on a
> performance improvement plan.  Based on these
> experiences and the somewhat relevant experience with no
> significant similar past performance beyond handling the
> ANG PHP program across one half of the nation, the board
> has limited confidence that 09C4 can successfully perform
> in a significantly expanded contract.

*Id*.

The SSEB thus itemized as OCI's past performance "weaknesses": 1) "Problems
with project management and handling personnel"; and 2) "Failure to keep the
government informed on key personnel decisions."  *Id*. at 5503-04.

OCI objects that, "First and foremost, evaluators were not supposed to know the
name of the offeror being evaluated.  Company names and logos were deleted from all
proposals and alphanumeric codes were used to keep proposals anonymous."  Pl.'s Mem.
at 21, citing the Solicitation's instructions at AR 968.  Indeed, of the three members of
the SSEB, it was Colonel Bringhurst who had apparently also participated in the meeting
in which agency personnel criticized the firing of Dr. Zeiger, *see* Post Meeting Report,
and thus had prior familiarity with OCI.

The Government, however, rightly points out that OCI itself made "unambiguous
references to its own identity" in its proposal.  Def.'s Mot. at 17 (citing AR 2856: "We
are a preferred vendor of the Air National Guard (ANG) and the prime contractor for the
eastern half of the ANG Psychological Health Program serving approximately 54,915
service members at 48 wings.  09C4 has developed and implemented a successful
Psychological Healthcare Program for the ANG, which began in October 2010 and is still
active today.").  More specifically, OCI identified itself by name in its past performance
questionnaire submissions. AR 6531-32, 6536-37, and 6541-42.  In any event, even if
OCI hadn't noted its own name, it is not surprising that an evaluator such as Col.
Bringhurst would have recognized OCI merely by virtue of its description of having
performed the ANG pilot project.  The court finds no abuse of discretion in the
evaluators' inference of OCI's identity.  "The solicitation and source selection plan
simply did not require the NGB's anonymous rating of proposals, which would not have
been feasible."  Def.'s Mot. at 18.

In addition, the court agrees with Defendant that there is no general or specific
provision in the Solicitation or Source Selection Plan prohibiting an evaluator's
application of personal knowledge in rating past performance.  Case authority is
persuasive as to the propriety of doing so.  *Labat-Anderson, Inc. v. United States*, 42 Fed.
Cl. 80-6, 842 n.54 (1999); *Seattle Sec. Servs., Inc. v. United States*, 45 Fed. Cl. 560, 568
(2000); and *Pitney Bowes Gov't Solutions, Inc. v. United States*, 94 Fed. Cl. 1, 14 (2010)
(citing *Labat-Anderson* and *Pitney Bowes*).  Moreover, the Solicitation, as noted earlier,

specifically advised that the past performance evaluation may be informed by "*sources other than those identified by the offeror* . . . ."  AR 975 (emphasis added).

In its most substantive disagreement with the Past Performance rating ("Somewhat Relevant, Limited Confidence," AR 5503) it received from the SSEB, OCI notes that the NGB had received two Performance Evaluations, both dated August 8, 2012, from the ANG Contracting Officer, Christine Pettigrew, with respect to OCI's work on the pilot program.  In the first evaluation, Ms. Pettigrew gave OCI the highest rating available, "Outstanding," on all five categories of performance – Compliance and Deliverables, Project Management, Timeliness, Forecasting Costs (re Cost Reimbursement Contracts), and Customer Satisfaction.  She also added hand-written comments: "vendor has always been compliant and met all deliverables," "PM [Project Management] has been effective with handling personnel," "no problem with the product or services deliverable on time," "vendor has always kept the customer informed," and "vendor has kept the customer satisfied[,] has always looked out for best interest of customer."  AR 6532-33.  In the second evaluation, Ms. Pettigrew rated OCI as Outstanding on four of the five categories of performance and "Good" on one category (applicable to cost-reimbursement contracts, not at issue here).  Her comments were: "met all deliverables in a timely manner," "PM has been effective and professional," "timeliness of performance was always met," and "kept company abrest (sic) of the hold (sic) contract."  AR 6537-38.

The three members of the SSEB, comprised of Capt. Hunter, Col. Bringhurst, and Lt. Colonel Laura Wheeler, however took issue with Ms. Pettigrew's ratings with respect to project management and personnel.  AR 5503.  In the individual evaluation notes, for instance, Capt. Hunter observed that Ms. Pettigrew's comments such as "compliant" and "no problem," although consistently stated, were inadequate, that is, "do not support" a rating of "outstanding."  AR 5070.  Thus, she wrote that the Board "questions the validity of the outstanding rating bec. of lack of rationale."  *Id.*  Lt. Col. Wheeler wrote, "ratings were not backed up by solid comments or N/A."  AR 5086.  Col. Bringhurst was more effusive: "Government rater gave 'outstanding' marks, but the comments reflected 'acceptable' level only.  Government rater's comments were inaccurate."  AR 5103.  He elaborated,

> This contractor is known by this rater as they manage the ANG Psychological Health Program.  Review of past performance ratings by the contracting officer show a discrepancy between the ratings of "outstanding" and then comments that suggest "acceptable."  Based on my personal knowledge of the companies (sic) performance they should be rated "acceptable."  In one case the contracting officer suggests the "pm has been effective in handling personnel" and later states, "vendor has always kept the customer informed."  Both of these statements are inaccurate.  There have been problems with both their

> management of personnel and keeping the ANG informed
> of key personnel decisions.

AR 5104.

Capt. Hunter gave OCI an overall rating of "somewhat relevant" because two of the three past performance contracts, unlike OCI's ANG pilot program work, were "not specifically related to" psychological health or were "not PH focused." AR 5070. For similar reasons, she gave OCI a "limited confidence" rating as well. *Id.* Lt. Col. Wheeler similarly found "relevance" in OCI's ANG experience, but not in the other two past contracts. AR 5086. With respect to confidence, Col. Wheeler determined that all three contracts warranted only a limited confidence rating "due to lack of ARNG DPH" experience. *Id.* Col. Bringhurst wrote, "Their ANG contract shows direct scope but not magnitude of effort for a national program. So overall they have 'somewhat relevant' past performance to 'relevant.'" AR 5104. He concluded, "based on their past performance challenges with a contract only ½ nationwide and no other significant similar performance, I have 'limited confidence' that 09C4 will successfully perform the expanded SOW [statement of work]." *Id.*

OCI argues that the evaluation it was given was irrational. The NGB had noted in the acquisition planning stage of the instant procurement, "Three small business entities [of which OCI was one] currently hold contracts for substantially similar requirements which will be subsumed by this family of contracts." AR 37. Thus, to assert that OCI "had no significant similar past performance beyond handling the ANG PHP program across one half of the nation," AR 5396, is nonsensical when OCI's pilot program experience "likely is the most relevant past performance reference." Pl.'s Mem. at 22. Yet OCI's argument overlooks the following salient components of the SSEB's determination: 1) OCI's pilot program indeed extended to just half of the country, whereas the Solicitation at issue was nationwide in geographical scope; 2) OCI's pilot program involved just the ANG, but that it had no experience in providing psychological health services to the ARNG; and 3) the SSEB's "somewhat relevant" rating was based in large part on the recognition that two of the three past performance examples proffered by OCI were not found particularly relevant to the behavioral health focus of the instant Solicitation.

Given the "heavy burden" on the protestor to demonstrate that the agency determination lacked a rational basis and that the court's inquiry is limited to whether the agency articulated a "satisfactory explanation" for its decision, the court is hard-pressed to second-guess the SSEB here.

OCI attempts to meet this burden, however, by its heavy reliance on the allegations related to the Dr. Zeiger matter. "This adverse past performance rating appears to be entirely based on OCI's decision to terminate one of its employees, Ms. Zeiger, who was apparently a former colleague and friend of members of the evaluation team, rather than any issues with OCI's actual performance under the contract." Pl.'s Mem. at 20.

Although this court has determined to admit the "Post Meeting Report," it finds that report at best ambiguous and ultimately an unreliable and one-sided rendition of the discussion between the agency and OCI regarding the termination of Dr. Zeiger.  There is no claim that the NGB ever reviewed, agreed with, or signed off on OCI's report of that meeting.  The Report's notes of "Points Discussed" and "Meeting Summary" begin under the heading of "Meeting Minutes," but the term "minutes" most generally connotes an approved record of proceedings.  Even as merely a recitation of the meeting, the Report does not identify who actually wrote the report, when it was compiled, or from what source it was compiled (contemporary notes, audio recording, etc.).  The legend at the bottom of each page recites, "These materials are proprietary information of Optimization Consulting, Inc. (OCI) and may not be used, disclosed, or reproduced for any purpose without the prior written consent of OCI."  While the Report certainly reflects that NGB personnel were quite distressed with the termination of Dr. Zeiger, and the manner and timing in which OCI communication that decision to the agency, it does not provide a convincing foundation for OCI's claims of bias in the instant Solicitation.

Moreover, in addition to the relatively weak rating that OCI received for the Past Performance factor, it also was rated poorly on the most important factor, Mission Capability.  For example, in evaluating OCI on sub-factor 1, Capt. Hunter observed that OCI's proposal "Blames Wing Commanders for problems [associated] with counselor placement."  AR 5061.  She also notes frustration with OCI's proposal, where it "Blames ANG for no SOP with previous award.  'Lack of policies at contractor start up – This should have been managed & policies should be developed by company before award!'"  *Id*.  She further critiqued OCI's data management plan: "talks about its importance but does not offer 'how or if' it has a solution to capture data."  *Id*.  It is also notable that Col. Bringhurst rated OCI "acceptable" on sub-factor 1, whereas both Capt. Hunter and Lt. Col. Wheeler gave OCI only a "marginal" score on that sub-factor.

In short, this court finds no basis for second-guessing the ratings that OCI received for Past Performance or for Mission Capability and thus no prejudicial violation of applicable statutes or regulations or of the evaluation criteria under the Solicitation.

D.  Evaluation of Goldbelt Glacier

In a separate front, OCI faults the NGB's evaluation of the past performance of Goldbelt Glacier, one of the eventual awardees, in particular alleging that Goldbelt Glacier misrepresented – as its own – the past performance of [***].  "Goldbelt Glacier made a material misrepresentation because it proffered [***] past performance as its own."  Pl.'s Mem. at 24.

In order to establish this claim, OCI must demonstrate: 1) that Goldbelt Glacier made a false statement; and 2) that the NGB relied on that false statement in selecting its proposal for the contract award.  *Blue & Gold Fleet*, 70 Fed. Cl. at 495.  "To preserve the integrity of the solicitation process when such a material misrepresentation influences the award of the proposal, the proposal is disqualified from consideration."  *Id*.  "[T]he

submission of a misstatement, as made in the instant procurement, which materially influences consideration of a proposal should disqualify the proposal." *Planning Research Corp. v. United States*, 971 F.2d 736, 741 (Fed. Cir. 1992).

The Solicitation provided that offerors were to submit "three (3) current or previous contracts for relevancy based on how well the contractor performed on projects of similar dollar value, scope, and complexity." AR 975. It further instructed, "For contractors with limited or no relevant corporate past performance, the three (3) current or previous contracts submitted may reflect information regarding the past performance of predecessor companies, key personnel with relevant past performance, or subcontractors that will key aspects of the requirement. *Id.*

In its Past Performance submission, Goldbelt Glacier, describing itself as the "36D6 Team" (referencing its alphanumeric designation), presented "three Past Performances that are similar in magnitude and scope to the requirements of the PH-RC Psychological Health program." AR 2374. The three programs it touted were: [***]. It is the first of these three examples to which OCI takes exception.

That contract, regarding [***], was actually performed by [***] of Goldbelt Glacier. Intervenor-Def. Goldbelt Glacier Health Svcs., LLC Resp. to Pl.'s Mot. for J. on AR ("Intervenor's Resp.") at 14. Goldbelt Glacier's proposal identified the "Company Name" for this past performance example as "36D6," which, as noted, was its alphanumeric identifier, not that of [***]. The submission also, however, provided the Cage Code[17] and DUNS Number[18] (per the instructions in the Solicitation, AR 975) that were particular to [***]. AR 2374; Intevenor's Resp. at 14.

Goldbelt Glacier explains in its brief that, where an offeror had "limited or no relevant corporate past performance" of its own, it was authorized instead to submit, as one among three options, a "previous contract" that reflected information regarding "key personnel with relevant past performance." AR 975. It avers, without any contradiction by OCI, that Goldbelt Glacier's president at the time of the proposal submission, Mr. Steve Cook, had been president of [***] prior to his having joined Goldbelt Glacier. In this manner, the proffer of the [***] contract for the [***] is properly encompassed in the "key personnel" aspect of past performance. Accordingly, because of Mr. Cook's roles with both Goldbelt [***], Goldbelt Glacier's listing of the [***] contract was consistent with the terms of the Solicitation. Furthermore, because the Solicitation directed offerors not to identify themselves or their subcontractors by name, it was not inappropriate to have identified "36D6" as the "Company," along with the Cage Code and DUNS Number specific to [***].

Moreover, as Defendant argues, Goldbelt Glacier's identification of itself, via its alphanumeric code, was not material "because it did not have a significant impact on the

---

[17] A CAGE ("Commercial and Government Entity") Code is a unique identifier given to suppliers to various government and defense agencies.

[18] A DUNS ("Data Universal Numbering System") Number is an identifier issued by Dun & Bradstreet.

determination that Goldbelt Glacier's proposal qualified it as within the competitive range. Def.'s Mot. at 23. The SSEB panel's comments on Goldbelt Glacier's past performance submissions as well as the contracting officer's competitive range determination evidence that the focus of the favorable rating given to Goldbelt Glacier was overwhelmingly derived from a favorable impression of its [***] past performance examples. AR 5120-21, 5152, 5160, 5796.

The court thus finds no material misrepresentation by Goldbelt Glacier in its past performance submissions.

E. Referral to SBA for Nonresponsibility Determination Not Required

OCI objects that its technical evaluation ratings by the NGB amounted to a determination of nonresponsibility, which, by statute, requires referral to the Small Business Administration ("SBA") for a conclusive finding. "The Agency's determination that OCI lacks the requisite management and resources to perform the contract is tantamount to a non-responsibility determination." Pl.'s Mem. at 31. Because no SBA finding was made in this respect, Plaintiff argues, it was improperly excluded from the competitive range.

As decisions of the United States Government Accountability Organization ("GAO") have noted, "Under the Small Business Act, agencies may not find a small business nonresponsible without referring the matter to the SBA, which has the ultimate authority to determine the responsibility of small businesses . . ." *Capitol CREAG LLC*, B-294958.4, 2005 CPD P 31 at 6 (citing 15 U.S.C. § 637(b)(7). The statute specifies that the SBS is empowered:

> To certify to Government procurement officers, and officers engaged in the sale and disposal of Federal property, with respect to all elements of responsibility, including, but not limited to, capability, competency, capacity, credit, integrity, perseverance, and tenacity, of any small business concern or group of such concerns to receive and perform a specific Government contract.

15 U.S.C § 637(b)(7)(A). "Responsibility concerns, among other factors, whether a prospective contractor will be able to comply with the required or proposed delivery or performance schedule, and whether it has the necessary organization, experience, and technical skills (or the ability to obtain them)." *Capitol CREAG* at 6-7 (citing FAR § 9.104-1(b), (e).

OCI cites three examples of what it characterizes as nonresponsibility determinations by the SSA relating to OCI's ability to perform: 1) that OCI had "issues with MIS, data capture, lack of SOP and counselor placement which the board feels is indicative of a lack of relevant experience necessary to proactively address potential performance challenges" (AR 5625); 2) that its "description of corporate management

appears weak, as the offeror proposes email and weekly activity reports where the board feels a simple conference call would be timelier for issues resolution as well as in keeping communication channels open" (AR 5625); and 3) that OCI's past project management and personnel handling experiences and the "no significant similar past performance" other than the ANG PHP program gave the board "limited confidence that 09C4 can successfully perform in a significantly expanded contract" (AR 5633). Pl.'s Mem. at 31.

Defendant responds that referrals to the SBA under section 637 are triggered only when there must be a determination of "all" of the elements of responsibility and that, per the implementing provisions of 48 C.F.R. (FAR) 19.602.1, "a contracting officer only makes a responsibility determination *after* a small business firm is determined to be an apparently successful offeror." Def.'s Mot. at 30 (emphasis added); *see also Capitol CREAG* at 7 (responsibility review normally conducted post-evaluation).

The court does not find the Government's position here initially dispositive. It agrees with the GAO that, where traditional "responsibility" factors are employed as technical evaluation criteria and the evaluation renders an offeror's proposal flatly ineligible for award, "the agency has effectively made a determination that the small business offeror is not a responsible contractor capable of performing the solicitation requirements." *Id.* On the other hand, where the "responsibility-type criterion" is applied in a "comparative or tradeoff analysis," it is not "tantamount to a nonresponsibility determination." *Id.*

Thus, for example, in *Capitol CREAG*, the offeror's approach to management and staffing factors, which may sometimes be considered responsibility criteria, was found to create "a high risk of unacceptable performance" even though it was not technically "inadequate." The offeror's proposal was rated "marginal," rather than "unacceptable." The GAO re-emphasized that "no SBA referral is needed where the small business offeror is not selected for award merely because, while its proposal is evaluated as acceptable, another offeror's proposal is evaluated as superior under a comparative analysis or because of a cost/technical tradeoff analysis." *Id.* n.6. Similarly, in *Nomura Enterprise, Inc.*, B-277768, 97-2 CPD ¶ 148 at 3 (Nov. 19, 1997), GAO noted the general rule that "[a]n agency may use traditional responsibility factors [where] a comparative evaluation of those areas is to be made." A "comparative evaluation" is one with "competing proposals [that] will be rated on a scale relative to each other, as opposed to a pass/fail basis." *Id.* Similarly, in *Medical Info. Servs.*, B-287824, 2001 CPD ¶ 122 at 5 (July 10, 2010), GAO observed that "[w]here a proposal is determined to be deficient pursuant to a [comparative] evaluation, the matter is one of relative technical merit, not unacceptability, which would require a referral to the SBA."

Accordingly, the question is whether OCI's ratings – and exclusion from the competitive range – were the result of a comparative evaluation or the result of a "pass/fail" test. On the Solicitation's adjective rating scale, "Marginal" signified that a "proposal does not clearly meet requirements and has not demonstrated an adequate approach and understanding of the requirements. The proposal has one or more

weaknesses which are not offset by strengths.  Risk of unsuccessful performance is high."
AR 5575.  By contrast, "Unacceptable" meant that the "proposal does not meet the
requirements and contains one or more deficiencies.  Proposal is unawardable."  *Id.*
Likewise, the definitions for "Limited Confidence" and "No Confidence" under the Past
Performance factor demonstrate that, in the first instance, the agency retains some, albeit
limited, confidence in the offeror's ability to perform, while it has none for a recipient of
the lowest technical rating.  AR 5576-77.  OCI, clearly therefore, was not ruled out of
consideration on a pass/fail basis as it would have been had it received an "Unacceptable"
or "No Confidence" rating (and as other offerors had been, AR 5580).  Rather, its
deficiencies related to how it proposed to perform.  *See, e.g., Capitol CREAG* at 8.

Three of the 10 offerors did receive "Unacceptable" ratings on one or more
factors or subfactors, AR 5762, and were deemed "unawardable as submitted."  AR 5881.
Of the remaining seven offerors, four were determined to qualify for the competitive
range.  Goldbelt Glacier, for example, received ratings of "Outstanding" for the most
important factor, Mission Capability, and both of its subfactors.  The other three in the
competitive range all were rated "Good" for Mission Capability and both its subfactors.
OCI, however, was rated "Marginal" for this factor and subfactors, while the other two
offers who did not make it into the competitive range were rated "Acceptable," slightly
higher even than OCI.  The "Competitive Range Determination," signed by the
Contracting Officer and the Source Selection Authority, is extensive in its comparative
evaluation of the four offerors selected as within the competitive range with the three
offerors, among them OCI, that were not deemed "unawardable" but which, nonetheless,
were eliminated from the competitive range.  *See, e.g.*, AR 5890 ("Comparison of 36D6
[Goldbelt Glacier] to 09C4 [OCI]").

There is thus no basis for finding that OCI was entitled at that stage of the
Solicitation process to a referral to the SBA for a responsibility determination.

IV.    Conclusion

For the reasons stated above,[19] the court finds no basis to disturb the NGB's
determination of the competitive range in this Solicitation.  Plaintiff's motion for
judgment on the Administrative Record is thus denied and Defendant's cross-motion is
hereby granted.

The Clerk of Court shall enter judgment accordingly.

s/ Edward J. Damich
EDWARD J. DAMICH

---

[19]  The court also finds insubstantial OCI's argument that the involvement of Karen Klepadlo as a contract
employee for the NGB created an appearance of impropriety.  The email to which OCI refers was neither
nefarious nor an encouragement to OCI's employees "to move to OCI's competitors."  Pl.'s Mem. at 29.
Similarly insubstantial are OCI's insinuations of "taint" due to the attenuated string of Ms. Klepadlo's past
affiliations.  *Id.* at 29-30.

Judge